[Civ. No. 17828. First Dist., Div. One. Dec. 5, 1958.]

MAX G. HANDLEY et al., Respondents, v. FELICE D. GUASCO et al., Appellants.

Kennedy, Bloom, Fletcher & Burbank and A. Lawrence Burbank for Appellants.

Harold R. Hayes, Gupta & Gupta and Kamini K. Gupta for Respondents.

BRAY, J.—Plaintiff Handley recovered judgment against defendants for $2,175, and plaintiff Gosliner for $2,668.70. Defendants appeal.

## QUESTIONS PRESENTED

1. Sufficiency of the evidence.
2. Was estimated loss of profits recoverable?

## RECORD

Plaintiff Handley sought specific performance and damages if it could not be had for nonperformance of an alleged lease of real property owned by defendants dated July 16, 1952. Plaintiff Gosliner sought similar relief for nonperformance of an alleged lease of a portion of the same property dated July 17.

Defendants Felice Guasco and Teresina Guasco were the joint owners of a certain store in San Anselmo, California. Felice planned to remodel the premises for use as two stores and then lease such stores. Felice orally authorized John Watrous, a licensed real estate broker who also carried on the business of mortgage loan financing, to negotiate for the financing of the remodeling and for leases. Watrous' authority to lease was subject to Felice's concurrence.

In April, 1952, plaintiff Gosliner approached Felice on the subject of leasing one of the two stores. He was willing to lease the entire premises with the right to sublet in order to get a lease. Felice introduced him to Watrous with the statement that Watrous was in charge of leasing the store, saying it was up to Watrous "to see what can be arranged," "he was in charge of leasing the store." Gosliner never saw Felice again.

Negotiations between Gosliner and Watrous continued through July 17, 1952, when Gosliner dictated to Watrous a written proposal to lease one store for a period of 10 years at $200 per month, with an option to renew for a further five year period.

Watrous and Gosliner also looked for a tenant to take the other store. On July 10, 1952, plaintiff Handley contacted Watrous concerning a lease. After discussions with Watrous and Gosliner, Handley dictated his proposal to Watrous. It provided for a five year term, the first year rental to be $125 per month, with a rental of $175 per month for the remaining four years. Also included was an option to renew for a further 10 year period and a "first refusal to purchase the property."

Handley and Gosliner accompanied their proposals with checks representing the amount of the first and last months' rent called for in the respective proposals. Each check, at Watrous' request, was made payable to J. W. Watrous, Trustee.

Gosliner testified that he saw his proposal in Watrous' office on July 19, 1952. At that time it bore his and his wife's signature and also those of Felice and Teresina, and Watrous as well.

Between April and July, 1952, a contractor, Von Rotz, gave estimates on the remodeling. Von Rotz' estimator, on behalf of plaintiffs, testified that he made three estimates. The second estimate for remodeling was $10,000. The third, which in-

cluded plans and sketches submitted by Handley, was approximately $18,000. This estimate was given to Watrous approximately a week after July 16, 1952. Gosliner stated that an earlier estimate by Von Rotz was for $16,000.

Felice abandoned the idea of remodeling and leasing after the estimates as he did not want to use any money above what he was to obtain by loan. He then sold the property to one Albert. Felice put his deed into escrow on July 31, 1952.

From July 16 through July 29, Handley and Gosliner made constant inquiry of Watrous as to the status of the proposals. Each testified that Watrous informed them that the proposals were signed by defendants and were being used, and needed, to process the loan application. They were told that they would receive their copy of the agreement as soon as the loan went through. Watrous (testifying by deposition) denied that Felice had ever signed the proposals to his knowledge. Felice and Watrous both testified that they believed Mrs. Guasco had signed both proposals. Mrs. Guasco testified that Felice had told her that he had rented the store to two men.

On July 29, 1952, Watrous, in the presence of Gosliner, destroyed both the original and copy of Gosliner's proposed agreement. Gosliner did not at any time acquire physical possession of the document after July 17, 1952.

On this same day, Watrous destroyed Handley's proposed agreement after tearing off the portion containing Handley's signature. The portion torn off was sent to Handley by mail.

Watrous returned the checks to the respective makers on the same day upon which he tore up the agreements.

The trial judge found that the defendants duly executed and delivered the respective agreements to lease to the respective plaintiffs; that defendants knowingly and intentionally sold the property on or about July 29, 1952; that defendants wilfully caused the destruction of all copies of the agreements; that defendants refused to carry out the agreements; that defendants made it legally impossible to carry out the terms of the agreements, and, therefore, specific performance was impossible.

*1. Sufficiency.*

Defendants contend that the evidence was not sufficient to support the court's findings that the agreements were signed by defendants, and that they were delivered. As to the Handley agreement there is no evidence that it was signed by

the Guascos. Handley never saw it after signing and leaving it with Watrous.*

As to the Gosliner agreement Gosliner testified that the signatures he saw on the document the only time he saw it after he had signed it, were typewritten ones. He further testified that had the signature been in Guasco's handwriting he could not have identified it as he did not know Guasco's handwriting. Both Felice and Watrous denied that Felice had signed either agreement although Teresina had signed them both. Both Handley and Gosliner testified that Watrous told them both agreements had been signed by both defendants. Watrous denied telling them that either had been signed by Felice. The trial court evidently believed Handley and Gosliner on this subject. Hence the only evidence in the case to the effect that Felice had signed the papers is the extrajudicial statement by his agent to the plaintiffs that he had signed. Is that sufficient proof to support the finding? Under the circumstances of this case, we think it was.

■ Generally, after the existence and scope of an agency is proved by independent evidence, admissions of declarations relative to the transaction or business within the scope of the agent's authority may be given in evidence against the principal. Such admissions must have been made during the continuance of the agency and while the agent was acting in the course of the transaction entrusted to his care. (19 Cal. Jur.2d 185.) Or, as stated in an old case, *Hubback* v. *Ross* (1892), 96 Cal. 426, 430 [31 P. 353], "[A]ny declarations made by such agent at the time of the transaction of the business intrusted or apparently intrusted to him, and relating to such business, is admissible as a part of the *res gestae.*" ■ Defendants' main argument is, as Watrous' agency was only to negotiate the terms of the proposed leases and had no authority to bind the defendants, that any statement committing defendants on the agreement is without his authority. He, therefore, was binding the defendants, argue defendants, in stating that the agreements were signed. Examples supporting defendants in principle are *Hutchings* v. *Castle* (1874), 48 Cal. 152, wherein it was held that declarations of an agent whose authority was limited to custody of goods were not admissible against his principal where the declarations were opinions as to the rights of the parties; and

*Watrous did not testify at the trial as he died before it began. However, his deposition was read. Originally he was a defendant but the action was dismissed as to him.

*Dillon* v. *Wallace* (1957), 148 Cal.App.2d 447 [306 P.2d 1044], where it was held that a store manager was not making declarations within the scope of his authority when he admitted fault and thus such declarations were not admissible. However, it was indicated that if the manager had the authority to negotiate or settle claims such declarations would probably have been admissible. But in this case the declaration was made in the course of the transaction of the business entrusted to Watrous and within the scope of the agency. Although it is true that Watrous had no authority to legally bind the defendants on the agreements, it is a fact that he was entrusted with the duty to see that the defendants obtained leases and financing. And the statement was made to plaintiffs in explanation of the fact that they had not received their copies of the agreements, which explanation was that they were needed to get the loan. It was not a statement binding defendants to anything but only in explanation since the plaintiffs were told by Felice to deal exclusively with Watrous for the leases. (See *Brandt* v. *Krogh* (1910), 14 Cal.App. 39, 55 [111 P. 275]—''In the case of a contract, if the agent, at the time of making the contract, makes any representation, declaration or admission, whether true or false, touching the matter of the contract, it is treated as the representation, declaration or admission of the principal himself.'') Moreover, there was no objection to this testimony by the defendants. ■ It is the general rule that objections not made in the trial court to evidence erroneously admitted will not be considered on appeal.

■ Moreover, the court found that defendants ''wilfully'' and ''wrongfully'' caused the agreements and copies to be destroyed. The intentional tearing off of the portions of the agreements where the signatures would appear raises an inference that the signatures were on them. ■ ''[T]he inference which arises from proof of intentional destruction is that the truth which would have conclusively appeared from the production of such evidence would have operated against the despoiler.'' (*Tilton* v. *Iowa Oil Co.* (1934), 139 Cal.App. 93, 97 [33 P. 446]; see 19 Cal.Jur.2d 144, and Wigmore on Evidence, 3d ed., vol. VII, § 2132, p. 577.) It is not a conclusive inference but one which the trier of fact may weigh with the other evidence in the case.

*Fox* v. *Hale & Norcross S. M. Co.* (1895), 108 Cal. 369, 416-417 [41 P. 308], relied upon by defendants for the proposition

that destruction merely makes admissible secondary evidence of an instrument destroyed or suppressed, does not so hold, except by taking some of its language out of context. Reading it as a whole, the case supports the rule we have set forth above.

■ The statute of frauds (Civ. Code, § 1624) is not involved here. There is no oral agreement being considered. It is simply a question of proof as to whether the agreements which are sufficient to comply with the statute of frauds were signed. No objection was made to any of the evidence as to the execution of the agreements or their contents. Thereby defendants waived their right to rely upon any provision of the statute of frauds. (*Pao Ch'en Lee* v. *Gregoriou*, 50 Cal. 2d 502, 506 [326 P.2d 135].)

■ Defendants contend that the court's findings to the effect that the agreements were delivered to plaintiffs are unsupported. There was no physical or manual delivery to either plaintiff. The agreements at all times were left with Watrous, who was the agent of defendants. A written contract takes effect only upon delivery. (Civ. Code, § 1054.) ■ It is not executed until it is subscribed *and delivered.* A manual or formal tradition is not indispensable to an effective delivery. (*Chaffee* v. *Sorensen* (1951), 107 Cal.App. 2d 284, 291 [236 P.2d 851] ; *Kreling* v. *Walsh*, 77 Cal.App.2d 821, 833 [176 P.2d 965].) ■ "That delivery of an instrument is a question of intent has long been the rule in this state." (*Kreling* v. *Walsh, supra*, at p. 833.) ■ Whether an instrument has been delivered is a question of fact to be determined from all the attendant circumstances. ■ And in *Chovin* v. *Miranda* (1936), 18 Cal.App.2d 193, 195 [63 P.2d 845], it was held, "Retention of a lease by the lessor is not conclusive evidence of its nondelivery; if such retention is with the consent of the lessee, it must be considered as delivered if the parties understand it has been executed and is in operation."

■ Plaintiffs' evidence shows that defendants signed the documents and returned them to Watrous who did not deliver them to the respective plaintiffs only because it was necessary to retain them in order to obtain the improvement loan. Defendants' evidence was to the contrary. But the court resolved this conflict in favor of plaintiffs. Watrous assured plaintiffs that they would get their respective copies upon the loan going through. He told Handley that the bank was looking at the documents and " '. . . I have the leases, and they are just

as good as in your hands. You don't have a thing to worry about. . . .'" A reasonable inference from the plaintiffs' evidence is that Felice upon signing and handing the leases to Watrous intended that they take effect immediately.

We have examined the portions of the transcript where defendants contend there was testimony to the effect that it was understood by the parties that the leases were either not to be delivered or to become effective until financing of the building was secured. The cited portions as well as the testimony as a whole do not support that contention. At most they show that there was a discussion of the fact that Guasco intended to get a loan for the construction of the building, that Watrous would have no difficulty in getting such a loan, and that the rental to be inserted in the lease would have to be attractive for loan purposes.

### 2. *Damages.*

 In the awards of damages the court allowed plaintiff Handley $2,000 and plaintiff Gosliner $1,366.67 for "Damages in lieu of Specific Performance. Loss of anticipated profits four (4) months." Defendants contend that these awards were improper as a matter of law since plaintiffs respectively were to engage in new businesses at new locations. Gosliner operated a men's and boys' wear store in San Francisco. In seeking the lease in question he proposed to expand his business to San Anselmo. Handley operated a bootery in Mill Valley. It is not clear whether he intended to move his existing business or to expand it by establishing a branch store.

"The measure of damages for the breach of an obligation arising from contract 'is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom.' (Civ. Code, § 3300.) More specifically, the detriment caused by the breach of an agreement to lease is the difference between the agreed rental and the rental value for the term at the time of the breach, or, as sometimes expressed, 'the fair value of the use of the premises.' " (*Lewis* v. *James*, 134 Cal.App.2d 15, 22 [285 P.2d 86].) . Instead of applying this rule applicable to breaches of agreement to lease the court apparently attempted to apply the rule as to other types of contract, which under certain circumstances may allow the injured party to recover loss of profits, but even under this rule no recovery may be

had for loss of anticipated profits of a business not yet established. As said in *Hoag* v. *Jenan*, 86 Cal.App.2d 556, 564 [195 P.2d 451], quoting from 104 A.L.R. p. 131: " 'There is a well-established distinction, in respect of the ascertainment of future probable profits, between a new business or venture and one in actual operation. In the first, the prospective profits are too remote, contingent and speculative to meet the legal standards of reasonable certainty; while in the second, the provable data furnished by actual experience provides the basis for an estimation of the quantum of such profits with a satisfactory degree of definiteness. (Citation of authorities.) In the one case, the success of the business usually depends upon a variety of circumstances, and the outcome is therefore too uncertain to provide a tangible basis for computation; while in the other, past experience has demonstrated the success of the enterprise and provides a reasonably certain basis for the calculation of plaintiff's probable loss consequent upon the breach of the contract to lease . . . ' " ▮ See also *Lacy Mfg. Co.* v. *Gold Crown Mining Co.* (1942), 52 Cal.App.2d 568, 574 [126 P.2d 644]; and *California P. Mfg. Co.* v. *Stafford P. Co.* (1923), 192 Cal. 479, 485 [221 P. 345, 32 A.L.R. 114]), where the court said: "As a proposition of law, it is well established that loss of profits growing out of a breach of contract, and resulting to an unestablished business, is of too uncertain a character to constitute a basis for the computation of damages for the breach. (*Kettering* v. *Sheppard*, 19 N.M. 330 [142 P. 1128].)

▮ Where a new business or enterprise is engaged in, and damages by way of profits are sought for its interruption or prevention, the rule is that they will be denied, for the reason that such business is an adventure as distinguished from an established business, and its profits are speculative and remote, existing only in anticipation. (17 C.J., p. 797, § 118; *Shoemaker* v. *Acker*, 116 Cal. 239, 244 [48 P. 62].) The rule is one of necessity. Damages must be certain of ascertainment. ▮ If one engages in a new industry, there are no provable data of past business from which the fact can be legally deduced that anticipated profits would have been realized." See also *Weiss* v. *Revenue Bldg. & L. Assn.*, 116 N.J.L. 208 [182 A. 891, 104 A.L.R. 129, 131]; *Gibson* v. *Hercules Mfg. etc. Co., Inc.* (1927), 80 Cal.App. 689 [252 P.2d 780]. ▮ Plaintiffs state that the theory of damages awarded was based upon the principles set forth in *Noble* v. *Tweedy*, 90 Cal.App.2d 738 [203 P.2d 778]. There is nothing

in that case to support the theory. The court there stated: "The authorities uniformly hold that a proper measure of the tenant's general damages for a breach of the landlord's covenant to construct or repair is the difference between the reasonable rental value of the premises 'as is' and as contracted to be.'' (P. 743.) The damages the court allowed were not loss of profits but the present value of a difference in rental value of $75 per month over the period of the lease. In the complaint the plaintiff asked for damages for "claimed loss of profits, loss of earnings, prepaid rent, cost of equipment, etc,'' all of which the reviewing court designated as "special damages.'' "There was no allegation of the difference in rental value of the building as agreed to be constructed and as actually constructed.'' (P. 742.) On motion for new trial the defendants claimed that the witnesses testified to only "general damages,''—that is, difference in rental value; hence there was a variance between the complaint and the proof and the court had no right to award damages for the difference in rental value. The plaintiff contended also that the trial court's action had taken him by surprise and therefore he was entitled to a new trial. The reviewing court pointed out that the evidence of general damages was admitted without objection, that no claim of variance had been made prior to judgment, and that the order of the trial court in granting a new trial on the grounds of surprise and variance was erroneous and reversed the order. Thus, the Noble case, instead of supporting the court's action here, requires that it be reversed. It might be argued that because of the experience of both Handley and Gosliner in their respective businesses at their original locations, there might be a basis upon which to estimate prospective profits at the new locations respectively. Such a contention would be answered by *Lacy Mfg. Co.* v. *Gold Crown Mining Co., supra,* 52 Cal.App.2d 568, which involved the removal of a going mining business. There the court said (p. 574): "Moreover, the mining business of defendant had not been established at the new location; nothing was known of any of the items necessary to make adequate proof. Loss of profits resulting to a new business is too uncertain to constitute the basis for computation of damages resulting by reason of a breach of contract.'' (*Schumann* v. *Karrer,* 184 Cal. 50 [192 P. 849], is not in point. There the defendant leased to the plaintiff a butcher shop and adjoining slaughter house and also the defendant agreed not to engage in the butcher business in El Cajon Valley as long

·as the plaintiff did. The plaintiff claimed that the defendant refused to permit him to use a certain portion of the slaughter house and also competed against him in the butcher business. The court held that the plaintiff was entitled to damages for loss of prospective profits because of the interference with the plaintiff's business by not being able to use the whole of the slaughter house and by the defendant's competition. Obviously this was a different situation than the one in our case. Moreover, to base prospective profits of a business in a completely new location and city upon the experience of an old established business elsewhere would be highly speculative.

While evidence upon the question of difference in rental value was introduced, the court made no findings upon it. The portions of the judgment allowing damages for prospective loss of profits will have to be reversed and the case remanded ·for determination of the damages based upon such difference, if any.

That portion of the judgment in favor of plaintiff Handley awarding him the sum of $2,000 as loss of anticipated profits, and that portion of the judgment in favor of plaintiff Gosliner awarding him the sum of $1,366.67 as loss of anticipated profits are reversed and the case is remanded for determination of the general damages as herein set forth. In all other respects the judgment is affirmed. Plaintiffs will recover costs.

Peters, P. J., and St. Clair, J. pro tem.,* concurred.

A petition for a rehearing was denied January 2, 1959, and appellants' petition for a hearing by the Supreme Court was denied January 28, 1959.

---

*Assigned by Chairman of Judicial Council.